**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 230738-U

Order filed March 4, 2024

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 18th Judicial Circuit, Du Page County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-23-0738 Circuit No. 23-CF-2672 |
| HEGGIE D. CARR, | ) ) ) | Honorable Daniel P. Guerin, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HETTEL delivered the judgment of the court.
Justice Brennan concurred in the judgment.
Presiding Justice McDade specially concurred.

**ORDER**

¶ 1        *Held*:  Trial court did not abuse its discretion in granting the State's petition to deny pretrial release under section 110-6.1(a)(6) of the statute.

¶ 2        Defendant, Heggie D. Carr, appeals the trial court's decision to deny him pretrial release under section 110-6.1(a)(6) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/110-6.1(a)(6) (West 2022)). We affirm.

¶ 3                                I. BACKGROUND

¶ 4    Defendant was charged with two counts of involuntary servitude, threatening to cause physical harm (Class X) (720 ILCS 5/10-9(b)(1) (West 2022)) and two counts of "trafficking in persons" for labor (Class 1) (*id.* § 5/10-9(d)(2)). The State filed a verified petition to deny pretrial release, alleging defendant was charged with an enumerated offense, and his release posed a real and present threat to the safety of any person, persons, or the community under section 110-6.1(a)(6) of the Code.

¶ 5    The factual basis provided that on or about September 28, 2023, K.S. disclosed to officers that she had been a victim of sex trafficking by defendant. K.S. had met defendant when she, her mother, and siblings were staying at a hotel in Lansing, IL and were struggling financially. K.S. was approached by a woman who introduced her to defendant. Defendant offered her a job, which she believed would entail office work in exchange for which defendant would pay for a hotel room for her family. K.S. was taken by defendant to a hotel in Lombard, IL along with five additional women. K.S. provided as much identifying information for the women as possible including naming R.S. and K.B. Defendant resided at the same hotel. Initially, defendant provided K.S. with a phone and used her to arrange prostitution for the other women. Ads were placed online for the women, the rates for the sexual acts were set by defendant, the sexual acts were performed at the Lombard hotel, other hotels, and at the residence of "regular clients" in Illinois and Iowa. Within a short period of time, K.S. was forced into prostitution as well. Defendant had a series of rules set for all of the women, including they (1) were only allowed limited contact with their family or friends, (2) had to earn $3000 per day on weekdays and $5000 per day on the weekend, (3) were not allowed to leave without permission, (4) had to have an escort and could not speak to anyone when out, and (5) could not give their personal phone numbers out. K.S. further described that defendant provided food and weight gaining pills as

2

well as drugs including heroin, crack, and marijuana to the victims. However, defendant withheld drugs if a woman was not being productive enough and restricted the women's amount of sleep. Defendant threatened K.S.'s family and was physically abusive, including choking her until she lost consciousness on at least two occasions.

¶ 6 During the investigation officers found prostitution ads for K.S. and other women who had been named by K.S. Officers ultimately identified thousands of ads with over a thousand profiles for the women which were connected to defendant dating back to August 23, 2021 (defendant had been released from the Illinois Department of Corrections (IDOC) on parole on July 20, 2021). Pursuant to a search warrant, a forensic extraction was completed on the phone defendant provided to K.S., which showed payments for prostitution received by defendant both in cash and through electronic applications; communication by defendant with the victims before, during, after sexual service, guiding and giving direction on type and price of service; and communication stating defendant was watching through a camera in the hotel room. Defendant also communicated about the sale and use of narcotics including asking one of the women to check if another had overdosed. R.S., identified by K.S. as a victim, died of a drug overdose in June 2023. Previously, officers had been dispatched multiple times to a hotel for altercations with R.S. and defendant.

¶ 7 Beginning in October 2023, officers conducted surveillance at a hotel in Lombard during which defendant was observed going in and out of a room on multiple occasions. Defendant was observed leaving just before a man entered the room and sitting in a vehicle in the hotel parking lot. When the man left, defendant returned to the hotel room or the women joined defendant in the vehicle. During this course of the investigation, multiple men were interviewed. Each advised they had arranged for sex through an online ad and that it had taken place in hotel room. On

November 29, 2023, an undercover officer arranged through the online ads for sexual services with two women at the hotel. Defendant entered and exited the room. After the undercover officer arrived at the hotel, defendant exited the hotel room and was subsequently taken into custody. At the time defendant was taken into custody he had in his possession six cellphones; a tablet; a laptop; ledgers containing women's names, phone numbers and ages; unopened condoms; antibiotic medication belonging to K.S.; business cards with K.S.'s picture on them; approximately $240 in what appeared to be counterfeit currency; credit cards belonging to K.B. and K.S.; and numerous other items belonging to additional women including credit cards, a Missouri driver's license and a Social Security card.

¶ 8          On November 29, 2023, during an interview, K.S. reaffirmed the information she provided in September 2023. She explained she returned to defendant because she was convinced she would be his girlfriend and no longer be forced to prostitute. However, once K.S. returned she was again forced into prostitution by defendant. During an interview, K.B. stated defendant threatened her on a daily basis and "pretty much" beat her every day. The abuse included surprise attacks by defendant while she was in the shower. She had bruises from defendant on her back. Further, defendant threatened to kill K.B. and her family. Defendant had K.B. in forced prostitution for approximately two years. Defendant had prior convictions for armed robbery, unlawful possession of a stolen motor vehicle, theft, involuntary servitude, and aggravated domestic battery. During defendant's 2010 arrest, a 16-year-old woman was found in his vehicle. She disclosed defendant brought her to Chicago from Tennessee to work for him as a prostitute. Further, the 34-year-old defendant had engaged in sexual intercourse with the minor as well as had the minor perform oral sex on him. In 2011, defendant's 11-year-old daughter disclosed to officers that she had been sexually abused by defendant.

¶ 9        A hearing was held on the petition on December 1, 2023. The State provided the factual basis. It indicated that in the pretrial risk assessment defendant indicated that he worked at Easy By Motors, but the Illinois State Police believed this to be a company that does not exist. The State said that defendant's bank records indicate that all deposits seemed to be from the women he forced into the sex trade. The State argued, "Well, let's think what could those conditions be? Well, we could put him on house arrest. Well, that won't stop him from bringing the girls into that home and changing that location if we have an actual viable true home. Well, maybe we can put him on GPS. Well, we will know where he is, where he's beating the girls and selling them."

¶ 10        The trial court granted the State's petition, finding that it met its burden by clear and convincing evidence. Specifically, the court found that "based upon the nature and circumstances of the offense as well as defendant's history, character and condition, the Defendant poses a real and present threat to the safety of any person or persons of the community ***." It noted that "there are several women that have either been threatened or allegedly been forced into this involuntary servitude by the Defendant." The court further found that "based upon the evidence produced and enunciated by the State, that there is no condition and [*sic*] combination of conditions set forth in the Safety [*sic*] Act that could mitigate the real and present threat ***." The court's written decision consisted of a check-the-box form. On it, the court checked several boxes indicating its "reasons for concluding the defendant should be denied pretrial release and why less restrictive conditions would not avoid a real and present threat," including (1) the nature and circumstances of the offenses charged, (2) defendant's prior criminal history is indicative of violent or abusive behavior, (3) defendant's social history indicates a violent and abusive nature, (4) the existence of specific threats posed by defendant, and (5) defendant's status as a parolee at the time of his arrest.

5

¶ 11                                                    II. ANALYSIS

¶ 12            On appeal, defendant contends that the court abused its discretion in granting the petition

to detain. We consider factual findings for the manifest weight of the evidence, but the ultimate

decision to grant or deny the State's petition to detain is considered for an abuse of discretion.

*People v. Trottier*, 2023 IL App (2d) 230317, ¶ 13. Under either standard, we consider whether

the court's determination is arbitrary or unreasonable. *Id.*; see also *People v. Horne*, 2023 IL App

(2d) 230382, ¶ 19.

¶ 13            Everyone charged with an offense is eligible for pretrial release, which may only be

denied in certain situations. 725 ILCS 5/110-2(a), 110-6.1 (West 2022). The State must file a

verified petition requesting the denial of pretrial release. *Id.* § 110-6.1. Where the State is

seeking to detain a defendant under section 110-6.1(a)(6) (dangerousness standard), it has the

burden of proving by clear and convincing evidence that (1) the proof is evident or presumption

great that defendant committed a detainable offense, (2) defendant poses a real and present threat

to any person or the community, and (3) no conditions could mitigate this threat. *Id.* § 110-

6.1(e)(1)-(3). When determining a defendant's dangerousness and the conditions of release, the

statute includes a nonexhaustive list of factors the court can consider. *Id.* §§ 110-6.1(g), 110-

5(a). In considering which conditions, if any, will "reasonably ensure" the safety of others or the

community and the likelihood of compliance with conditions of pretrial release, the court may

take into account (1) the nature and circumstances of the offense, (2) the history and character of

defendant, (3) whether defendant was on probation or parole at the time of the offense, and (4)

the nature and seriousness of the threat to the safety of any person or persons or the community.

*Id.* § 110-5(a)(1), (3), (4).

¶ 14        We cannot say that the court abused its discretion in granting the State's petition. First, defendant was charged with detainable offenses, and, based on the evidence presented in the proffer, the proof was evident that he committed the offenses. Second, the evidence showed that defendant was a threat to the women mentioned in the proffer and the community in general, where he forced women into prostitution, beat them, and threatened them and their families. Third, we cannot say it was against the manifest weight of the evidence for the trial court to find no conditions would mitigate defendant's dangerousness. Defendant was on parole for aggravated domestic abuse at the time of the offense and, as discussed at the hearing, home or GPS monitoring would not prevent defendant from committing the acts in this case. Therefore, the court did not abuse its discretion in granting the State's petition to deny pretrial release.

¶ 15                                    III. CONCLUSION

¶ 16        The judgment of the circuit court of Du Page County is affirmed.

¶ 17        Affirmed.

¶ 18        PRESIDING JUSTICE McDADE, specially concurring:

¶ 19        The crimes alleged against this defendant are reprehensible and we can all agree that no one who commits such actions should be released into the community without significant restrictions. However, we do not always agree on what the State is required to present to comply with the statute.

¶ 20        In the instant case, I would find that, viewed in its entirety, the hearing produced sufficient information about the unavailability of viable conditions to find that detaining this defendant until his trial was not an abuse of the trial court's discretion. For this reason, I concur with the majority decision. Arriving at that point, however, appears to me to have been simply fortuitous.

7

¶ 21 I write separately because the statute that drives our decision is new and it represents a dramatic change from the way in which pretrial detention was handled prior to its enactment. The decisions we are writing now are creating the body of precedent for this new law, and I want to set out what I think it requires, particularly as it relates to conditions of release. The statute creates a *presumption* that all persons charged with specified crimes are eligible to be released pending trial. 725 ILCS 5/110-6.1(e) (West 2022). It then allows that presumption to be rebutted by the State, but only on very specific terms, which the majority partially spells out. *Id.* A pretrial defendant can only be *denied* release if the State alleges his dangerousness in a verified petition and proves three elements by clear and convincing evidence. *Id.*

¶ 22 First, the State must prove that the defendant is charged with a crime or crimes to which the statute applies, and that it is likely that he committed them. *Id.* § 110-6.1(a), (e)(1). Here, the State has made that showing.

¶ 23 Second, the State must prove, again by clear and convincing evidence, that the defendant "poses a real and present threat to the safety of a person, persons, or the community," based on the specific articulable facts of the case. *Id.* § 110-6.1(e)(2). Some types of conduct that can support the showing of dangerousness are set out in the statute. See *id.* Here, the State has also made a sufficient showing of defendant's dangerousness.

¶ 24 Third, when, as here, the State has met its burden of proving the first two factors, it must make the final, critical showing that, despite the presumption, this defendant cannot be released into the community because there is no condition or combination of conditions that can "mitigate" the risk of danger he poses to the safety of others—or the risk of flight, if relevant. *Id.* § 110-6.1(e)(3).

8

¶ 25    Consideration of the statutory language, including the express *intent* of the legislature, compels the conclusion that the State is required to do more to satisfy its burden of proof than it initially did here. First, the statute includes this showing of the unavailability of release conditions as third and fourth factors, separate from the first two, and it states them in the conjunctive, showing that this portion of the State's burden is not satisfied merely by presenting evidence on the first two factors. See *id.* § 110-6.1(e). Second, it reiterates, frequently, the phrase "conditions or combination of conditions" which suggests it expects both actual effort and some creativity by the State in considering the possible terms of release and showing why *none* would be effective in the particular case. See *id.* Third, it requires the State to "bear the burden of proving by clear and convincing evidence that: . . . (3) no condition or combination of conditions . . . can mitigate (i) the real and present threat to the safety of any person, persons or the community based on the specific articulable facts of the case. . . ." *Id.* § 110-6.1(e)(3).

¶ 26    The State, in this case, appears to have made no real effort to seriously consider whether any of the nonexhaustive list of conditions set out in the statute itself, or any other possible conditions, alone or in combination, could "mitigate" defendant's proven dangerousness. During the hearing, the prosecutor advised the court that defendant was on probation when he allegedly committed the crimes charged. Then she made, specific to conditions of release, three sarcastic comments about the general ineffectiveness of home confinement, GPS monitoring, and "pretrial conditions." I do not believe this is the serious consideration of release conditions that the legislature had in mind; the statute reflects too much attention to detail regarding this issue for me to believe it expected off-hand references to suffice. Fortunately, defense counsel pushed back and an extended detailed discussion provided more information. Defendant, however, bears no burden in this proceeding and the State cannot count on this type of fortuity in other cases.